# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **SHELLIE WONSOWSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 15 C 3795** |
| **v.** | ) | |
| | ) | **Magistrate Judge Geraldine Soat Brown** |
| | ) | |
| **UNITED OF OMAHA LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Shellie Wonsowski brought this claim against defendant United of Omaha Life
Insurance Company ("United of Omaha") under the Employee Retirement Income Security Act
("ERISA"), 29 U.S.C. § 1132(a)(1)(B), after United of Omaha stopped paying Wonsowski benefits
under a long term disability policy  (Compl.) [Dkt 1.]  United of Omaha provided long term
disability benefits to Wonsowski until August 18, 2014, because of symptoms she experienced in
connection with a  number of health conditions, including idiopathic gastroparesis. *(Id*. ¶¶ 8-9.)
Wonswoski claims that her disability continued beyond August 18, 2014, and that she remains
incapable of performing the duties of either her occupation or any occupation.  (*Id.* ¶ 15.)
Wonsowski seeks all benefits due since August 18, 2014, with accrued interest, and a declaration
of entitlement to her benefits so long as she continues to meet the Policy's terms and conditions.

(*Id.*; PO at 2.)[1]  Wonsowski also seeks attorneys' fees pursuant to 29 U.S.C. § 1132(g).  (Compl. at 5.; PO at 2.)

A bench trial was conducted on March 31, 2016.  [Dkt 42.]  Wonsowski testified in person and the parties submitted the deposition testimony of Dr. Sheeja Jain, Wonsowski's primary internal medicine physician, and Dr.Manoj Mehta, a consulting physician for United of Omaha.  [Dkt 39.][2] Wonsowski submitted her post-trial brief on April 19, 2016 (Pl.'s Brief [dkt 44]), and United of Omaha filed its post-trial brief the same day (Def.'s Brief [dkt 45]).

After considering the testimony, the exhibits introduced into evidence, and the written submissions of the parties, the court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).  To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions.  Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.  *See Miller v. Fenton*, 474 U.S. 104, 113-14 (1985).  For the reasons set out below, the court finds in favor of Wonsowski.

---

[1]  References to the trial transcript are cited as "Tr. at ___." [Dkt 43.]  The parties stipulated to certain facts in the Final Pretrial Order ("PO" [dkt 37]), which are cited as "Stip." They also submitted the Claims Record ("CR") as a joint exhibit.

[2]  The deposition testimony of Dr. Mehta and the complete Claims Record were provided directly to the court.  The parties shall preserve complete copies of the record until the time for appeal has expired.  The court finds that the Claims Record is appropriately supplemented by the depositions of Dr. Mehta and Dr. Jain and, accordingly, has considered those depositions, as well as the trial testimony by Wonsowski.  *Krolnik v. Prudential Ins. Co. of America*, 570 F.3d 841, 843 (7th Cir. 2009).

**JURISDICTION**

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Wonsowski's ERISA claim arises under federal law. Additionally, United States district courts have jurisdiction over actions brought by a participant or beneficiary of an employee welfare benefit plan. 29 U.S.C. § 1132 (e) and (f). Venue is proper because Wonsowski is a resident of the Northern District of Illinois, United of Omaha was doing business within this district, and the action arises from events occurring within this district. The parties consented to the jurisdiction of a magistrate judge. [Dkt 11.]

**FINDINGS OF FACT**

Professional Background and Job Description

Wonsowski was born in 1976 and is a resident of Warrenville, Illinois. (Stip. 2; Tr. at 7-8.) She graduated from Northern Illinois University in 2004, receiving a bachelor of science degree in mechanical engineering. (Stip. 2.) She holds a patent for a radial bushing to be used in agricultural sprayers. (Tr. at 16.) Beginning in September 2005, Wonsowski worked as a mechanical engineer for Miner Elastomer Products Corporation ("Miner"). (Stip. 3.) Miner's business dealt with all aspects of proprietary elastomers, which are a cross between rubbers and plastics. (Tr. at 10-11.) Miner created elastomer versions of shocks and suspensions. (Tr. at 11.)

Wonsowski described her duties as to "design new or modify existing designs, from concept/customer contact through production phase, ECR's, ECN's, drawings and all documents, test product/prototypes, assemble, coordinate assembly, etc." (Stip. 3 (quoting CR at 1676).) At trial she testified that her responsibilities as a mechanical engineer at Miner involved:

[e]verything from customer contact, initial concept, working with the customer to get specifications, prototyping parts, creating conceptual designs, many iterations, providing the prototypes and the testing to the customer, working with the materials department, the lab for testing, and assembling some of the larger products, working with production, everything from customer contact all the way through production. We'd create all the drawings, paperwork, prototype the parts, get all the steel components and elastomer components, go through the entire proprietary process, then kick it off to production and make sure that the lab and production had the proper procedure to make those parts in the future.

(Tr. at 12.)

She said that her job entailed being on her feet 25-30 hours out of a 40 to 45-hour work week, with the remainder of the time spent at her desk. (Tr. at 13.) She testified that designing was approximately 25 percent of her overall work, and that took place on the computer. (Tr. at 13-14.) She also testified that immediately before she stopped working in 2011, she was on her feet eight to eight-and-a-half hours per day because she was trying to get a project done with the lab. (Tr. at 32-33.)

Regarding her work in the lab, Wonsowski testified that she never operated the force testers they used, but she would be present with the lab employees and help them "put the components together into fixtures and stuff in the lab so we could test them." (Tr. at 14-15.) The lab was about ten times the distance of the courtroom, estimated by the court to be equivalent to roughly one-half to one city block in length. (Tr. at 15.)

Wonsowski also addressed her activities in the field:

We would go out and visit the customer, either go with sales to try and explain to the customer on a more technical basis what our product could do for them. We replaced average suspensions and rubber components. We were there to assist them and give all of the specifications with the products that we could design for them and work with them to get, you know, get through the design process. Then other times, it was to take our product directly to them, then deliver it, and then see them install it and use it. Then we would take video or pictures just to make them feel comfortable, you

4

know, with the product and have us there to answer any questions that the sales people didn't, you know, know how to answer.

(Tr. at 15-16.) She never personally installed a product for a customer. (Tr. at 16.) She made two to three field visits per year on average. (Tr. at 16.)

Long Term Disability Policy

Wonsowski was covered under Miner's long term disability benefits policy issued by United of Omaha (the "Policy," CR at 1-53), which contains the following provision:

**Total Disability** and **Totally Disabled,** for other than a **pilot,** means that because of an Injury or Sickness:

(a) You are unable to perform all of the material duties of Your regular occupation on a full-time basis; and

(b) You are unable to generate Current Earnings which exceed 20% of Your Basic Monthly Earnings due to that same Injury or Sickness; and

(c) after a Monthly Benefit has been paid for 5 years, You are unable to perform all of the material duties of any gainful occupation for which You are reasonably fitted by training, education or experience.

**NOTE:** Regular occupation, as used above, means a collective description of individual jobs as defined by the United States Department of Labor Dictionary of Occupational Titles. Such jobs are considered to belong to a given occupation due to similar job characteristics, requirements and qualifications. Material duties, as used above, means duties that are normally required for the performance of Your regular occupation, and cannot be reasonably omitted or modified. Total Disability is determined by Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

(Stip. 8; CR at 27 (bolding in original).)

On January 19, 2012, United of Omaha had an analysis performed by Vocational Consultant Sarah Coughlin, who identified Wonsowski's regular occupation as "Mechanical-Design Engineer,

Products," under Dictionary of Occupational Titles 007.061-022. (Stip. 13; CR at 1700-01.) The DOT describes that occupation as "Designs mechanical or electromechanical products or systems performing duties as described under DESIGN ENGINEER, PRODUCTS (profess. & kin.) Master Title." (DOT 007.061-022.) The Master Title's description states:

> Conducts analytical studies on engineering proposals to develop design for products, such as engines, equipment, machines, associated and subsystems components, and aerospace structures, utilizing and applying engineering principles, research data, and proposed product specifications. Analyzes data to determine feasibility of product proposal. Confers with research personnel to clarify or resolve problems and develops design. Prepares or directs preparation of product or system layout and detailed drawings and schematics. Directs and coordinates manufacturing or building of prototype product or system. Plans and develops experimental test programs. Analyzes test data and reports to determine if design meets functional and performance specifications. Confers with research and other engineering personnel and prepares design modifications as required. Evaluates engineering test results for possible application to development of systems or other uses. Design engineering personnel are classified according to discipline. May use computer-assisted engineering software and equipment.

The "Mechanical-Design Engineer, Products" occupation is performed at a sedentary exertional level and requires a Level 5 Reasoning Level: "Apply principles of logic or scientific thinking to define problems, collect data, establish facts, and draw conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables." (DOT 007.061-022, Appendix C.)

The Vocational Consultant also reported that the occupation is classified as "Highly Skilled," and "requires performing a variety of duties, dealing with people, directing, controlling or planning activities of others and making judgments and decisions." (CR at 1700-01.)

As discussed further below, Wonsowski disputes that "Mechanical-Design Engineer, Products" is the appropriate occupation.

6

Wonsowski experienced a significant change in her health in July 2006: she starting having extreme pains in her chest, which she attributed to heartburn. (Tr. at 17-18.) She underwent extensive testing. (Tr. at 18-19.) She consulted a gastroenterologist in Chicago and was referred to a gastroenterologist at the Mayo Clinic, where she went three times in 2007. (Tr. at 19.) After many months, she was diagnosed with severe gastroparesis. (Tr. at 18.) Gastroparesis is an abnormality in the rhythm of the stomach in which it does not empty properly, which can cause symptoms of abdominal pain, nausea, vomiting, and weight loss. (Dep. of Manoj Mehta at 7.) She testified that her condition is the result of damage to her vagus nerve, which left her stomach paralyzed, and by 2013, the damage had spread to similar paralysis in her colon. (Tr. at 23-24.) Her understanding is consistent with Dr. Mehta's review of Wonsowski's records. (Mehta Dep., Ex. 2 at 3.) He concluded that she suffers from idiopathic gastroparesis, and he stated that the records from Mayo Clinic also reflect a diagnosis of colonic inertia. (*Id*. at 3, 5.)

In December 2007, Wonsowski had a feeding tube inserted at the Mayo Clinic after she had gone from about 130 pounds to about 85 pounds in the span of one to two years. (Tr. at 26.) Initially, she was on the feeding tube 24 hours per day. (Tr. at 27.)

Wonsowski took some time off for the procedures and trips to the Mayo Clinic, but she worked throughout 2006 and 2007 "[o]ut of necessity." (Tr. at 26.) Her feeding tube was hooked up to a feeding pump in a backpack, and she was not allowed to go into the production or manufacturing area. (Tr. at 26-27.) With a combination of the feeding tube and pharmaceuticals, she was able to increase her weight to around 150 pounds around 2009. (Tr. at 27.) The feeding tube was removed in 2009. (Tr. at 27.)

Wonsowski had lifting restrictions and restrictions related to her feeding tube, on doctor's orders. (Tr. at 32.) She was restricted to desk work when hooked up to her feeding tube. (Tr. at 32.) Wonsowski testified that she worked against her doctors' advice because she wanted to contribute to her household and advance her career. (Tr. at 74.)

Wonsowski was also diagnosed with osteoporosis around the same time, in 2007-2008. (Tr. at 22.) She suffered from compression or "pars" fractures in her spine attributable to the osteoporosis, and was treated by a pain specialist, Dr. John Gashkoff. (Tr. at 20-22, 36; Stip. 28; CR at 399-426.) In 2008 or 2009, Wonsowski testified, she had radio frequency ablation procedures to sever nerves in her back that were causing pain. (Tr. at 35-36.) Wonsowski had started taking the osteoporosis drug Forteo at one time (CR at 1609), but the nutrients from the feeding tube helped to reverse the condition. (Tr. at 77.)

Wonsowski testified that her symptoms, including nausea and vomiting, had progressively worsened by the end of 2010 and early 2011. (Tr. at 27.) At the time, she was both working and studying at Illinois Institute of Technology for the professional engineering examination. (Tr. at 28.) She testified that she was vomiting "a lot . . . . During the classes, during work, during the exam." (Tr. at 29.) She took the exam in October 2010 but attributes her difficulty with, and eventual failure of, the professional engineering exam to her symptoms. (Tr. at 28-29.) At that time she was also working on designing suspensions for a mining truck. (Tr. at 32-33.) She was on her feet "eight to eight and a half hours a day" in the lab to get the suspensions assembled to fill an order. (Tr. at 33.)

In April 2011, Wonsowski had surgery to implant a gastric stimulator, an electrical device to pulse the stomach. (Tr. at 30; CR at 457.) The stimulator reduced her vomiting and nausea, but had negative side effects in the form of painful electrical shocks. (Tr. at 29-31.) Wonsowski

estimates she has visited Dr. Enrique Elli, who implanted the stimulator, thirty to forty times for setting adjustments in the attempt to find a balance between the getting the benefit of reducing her nausea and reducing the shocking. (Tr. at 55.) In 2012, Wonsowski had surgery to have the original stimulator replaced in an effort to reduce the shocking. (Tr. at 55.) In 2015, she had the second stimulator replaced because the battery had died. (*Id.*)

Wonsowski stopped working on April 5, 2011, when the gastric stimulator was implanted, and has not worked since. (Tr. at 31; Stip. 5.) Wonsowski testified that she does not believe returning to work in the near future is realistic. (Tr. at 54.)

She submitted a claim for long term disability benefits under the Policy, in which she stated that she was unable to work because of post-surgery pain, nausea, nutrition complications, and weight loss. She reported that extensive nausea, vomiting, dehydration, and lack of food caused her to miss work and change her routine. (Stip. 6.) Wonsowski included a physician's statement from Dr. Jain, who identified a primary diagnosis of gastroparesis with symptoms of weight loss, recurrent emesis, and fatigue. Dr. Jain listed the medications Wonsowski was taking and discussed Wonsowski's "severe shocks" from the gastric stimulator. Dr. Jain noted that the prognosis for recovery as "guarded," yet Dr. Jain expected Wonsowski to return to her prior level of functioning in approximately three to four months. (Stip. 9; CR at 1679-80.)

On December 20, 2011, Anne Girardot, RN, performed a medical record review and concluded that Wonsowski was not incapable of work, but also noted that she has a "behavioral health overlay which is most probably impacting her condition." (Stip. 10; CR at 1169-71.) After further correspondence with Dr. Jain (Stips. 11-12; CR at 1606-10), Terri Cortese, RN, completed medical reviews and reports in March and August 2012. In her March 2012 report, Ms. Cortese

opined that there "would be no limitations except that [Wonsowski] may require modifications in the work schedule allowing for 3 small meals during the workday rather than 1 traditional lunch hour." In her August 2012 report, she indicated her previously identified restrictions and limitations were not altered as a result of the additional medical information. (Stip. 14; CR at 1175-77, 1180-85.)

On August 15, 2012, United of Omaha approved Wonsowski's claim for long term disability benefits effective April 6, 2011. (CR at 1344-47.) Although the approval letter does not expressly state that benefits were granted for a mental and nervous disorder, it suggests that as the reason because it refers to the two year policy limit applicable to mental disorders, and the parties have stipulated to a similar understanding. (Stip. 15.) After accounting for the initial six month "elimination period" during which no benefits are payable, benefits were calculated to begin in October 2011 and could extend to October 2013. (Stip. 15; CR at 1344-47.)

At some point that is not clear in the record, United of Omaha extended benefits beyond the two year limitation for mental disorders. (*See* CR at 742.) Benefits were approved due to "gastroparesis – anxiety," with an expiration date in November 2041 when Wonsowski turns 65. (Stip. 7.) United of Omaha has stipulated that it is not arguing in this case that Wonsowski's benefits are limited to the two-year limitation for mental disorders. (*See* Stips. 7, 30; Tr. at 67-68.)

Wonsowski's gross benefit was calculated to be $3,358.39. (Stip. 7.) Promptly after awarding benefits, United of Omaha referred Wonsowski to The Social Security Law Group to assist her in obtaining Social Security disability benefits. (Stip. 16; CR at 1337-39.) On June 14, 2013, the Social Security Law Group informed United of Omaha that Wonsowski's claim had been approved by the Social Security Administration. (Stip. 17; CR at 1215-23.) The Social Security

Administration determined that disability began on April 5, 2011, noting a primary diagnosis of "gastritis and duodenitis" and a secondary diagnosis of "malnutrition (weight loss)." (Stip. 18; CR at 527.) United of Omaha adjusted Wonsowski's policy benefits to reflect the Social Security award, calculating a net policy benefit of $1,729.39 per month and a resulting overpayment of $20,172.60 based on duplication of benefit payments. Wonsowski has satisfied the overpayment. (Stip. 19; CR 1237.)

United of Omaha's Claim Review

As part of a claim review, United of Omaha requested medical records from Wonsowski's treating physicians, including Dr. Jain, Dr. Michael Camilleri and others at the Mayo Clinic, and gastroenterologist Dr. Stephen Holland, as well as from Adventist Bolingbrook Hospital and Dr. Elli. (Stip. 20.) Nurse Terri Cortese prepared an updated comprehensive medical file review in June 2013, opining that:

> [Wonsowski] would have restrictions and limitations to preclude standing for 6 hours out of an 8-hour workday, occasionally lifting no more than 20 pounds and frequently lifting up to 10 pounds for date's 5/10/2012 through 5/31/2013 for surgical replacement of gastric pacemaker generator. It is the opinion of this nurse reviewer than [sic] from 4/28/2011 through 5/9/2012 and from 6/1/2013 forward, it would be reasonable to expect [Wonsowski] to be able to walk or stand for 6 hours out of an 8 hour day. Lifting no more than 20 pounds on an occasional basis and up to 10 pounds on a frequent basis.

(Stip. 21; CR at 1723.)

Wonsowski underwent a functional capacity evaluation in October 2013 conducted by Michael Inoshita, M.S., P.T., who concluded that Wonsowski could perform work at the sedentary level. (Stip. 22; CR at 959-70.) He noted that she could not complete the treadmill test because she

became nauseated. (CR at 962.) He noted, "Dry heaved for several minutes in bathroom, physiological measure consistent with distress." (*Id.*)

Wonsowski was also in contact with her doctors at the Mayo Clinic in the fall of 2013. She reported that she continued to experience significant nausea despite taking anti-nausea medications, such as Tigan, Zofran, Famotidine, and Meclizine (for vertigo). The only significant improvement described after the implantation of a gastric stimulator was a reduction in the frequency of vomiting. In September 2013, Dr. Camilleri, Wonsowski's treating gastroenterologist at the Mayo Clinic, noted that tests done in July 2013 showed "unequivocal evidence of delayed colonic transit, especially at 48 hours." (CR 1001.) He deemed Wonsowski a candidate for a colectomy with ileorectal anastomosis, but advised her that they had not performed that surgery on a patient with a gastric stimulator. (*Id.*) Her local treating gastroenterologist, Dr. Stephen Holland, agreed with the proposal. (Stip. 23.)

During an office visit on December 19, 2011, Dr. Holland noted that Wonsowski "has had excellent response to the stimulator with 60-70% improvement on the nausea, which for her was fantastic and allowed her to get back to a normal life, in a relative sort of way." Wonsowski reported intermittent, multiple, short-lived, sharp, stabbing pain in and around the generator up to 100 times per day. During her February 13, 2012 office visit with Dr. Holland, Wonsowski reported that the shocking discomfort went away when the generator was turned off. At an office visit on January 21, 2013, Dr. Holland noted that the gastric pacer has shown "modest benefit," and that Wonsowski's weight was stable at over 100 pounds. Wonsowski reported low energy, and the report added: "Mentation seems to be somewhat better speaking with her today, but she feels it is still poor. In appearance, it is still minimal." (Stips. 25-27; CR at 318-21.)

Wonsowski continued seeing Dr. Jain in 2013 and also underwent treatment with anesthesiologist Dr. Gashkoff at DuPage Medical Group Spine Center. Dr. Gashkoff noted a diagnosis of lumbar Facet Syndrome/spondylosis at L4-5 and L5-S1, and administered a facet joint injection for her back pain on December 20, 2012. He performed a radiofrequency ablation of the L3 and L4 medial branch and L5 posterior nerve branches on March 18, 2013. (Stips. 28-29 (first); CR 369-92, 401, 416.)[3]

In May 2014, United of Omaha conducted an interview with Wonsowki and provided a claim synopsis for the file. It reported that, although the claim was originally approved as a behavioral health claim, based on a June 2013 nurse case manager review, "medical supported on going disability from a physical standpoint." (Stip. 30 (first); CR at 741-43.) Nurse Terri Cortese also performed an updated medical review on May 27, 2014, and reiterated her previous opinion that Wonsowski is able to sit for 6 hours out of an 8-hour day and lift no more than 10 pounds occasionally with possible frequent lifting of small objects weighing less than 10 pounds. She disagreed with Dr. Jain's opinions about Wonsowski's limitations: "Restrictions noted by physician are restrictive to the point of inability to perform ADL's [activities of daily living] and [Wonsowski] has been noted to be able to do her ADL's." (Stip. 31 (first); CR at 1734.)

On June 6-7 and July 21-23, 2014, United of Omaha performed video surveillance of Wonsowski based on its belief that there were contradictions between Wonsowski's self-reports, the results of the functional capacity evaluation, and the review of the available medical records. The surveillance showed Wonsowski driving, standing, walking, and unloading and loading her car trunk,

---

[3] The parties' stipulations have two sets of stipulations 29-34, as well as a third stipulation 34. The stipulations will be labeled as "first," "second," and "third" to identify which stipulation is referenced.

and Wonsowski was only seen once to be nauseous for about four to five minutes. (Stip. 32 (first); CR at 680-88, 706-14.)

United of Omaha also referred Wonsowski for an independent medical examination (IME) by Dr. Mehta in June 2014. (Stip. 33 (first); CR at 702.) Dr. Mehta submitted a report to United of Omaha on August 14, 2014 (CR at 631-639), concluding that Wonsowski "suffers from idiopathic gastroparesis," documented via gastric emptying study and significant weight loss. Dr. Mehta noted that "she does not appear to have a primary psychiatric diagnosis and denies any history of an eating disorder." Moreover, "her weight has been stable for at least the last three years since her gastric pacemaker was placed." Dr. Mehta further opined on Wonsowski's complaints of nausea:

> Nausea is a subjective complaint and one which would not be readily characterizable based on observation. Therefore, the claimant's video surveillance showing her ambulating and performing duties would not address underlying nausea. She was observed by the investigator to pull over and appeared to be nauseated and needing a rest before getting on the road after my office visit. Therefore, given the summary of medical information provided for objective review, as well as the claimant's offered history, it does appear that she has gastroparesis and continues to suffer from nausea. Whether or not this is disabling in its severity is a broader question. I foresee no reason why the claimant would not be able to work by virtue of her nausea regardless of its waxing and waning nature or even its intermittent heightened severity. This is particularly true with a modified work schedule. Similarly, I foresee no reason why working would aggravate her nausea. Her previous modified work routine did seem to be acceptable to her employer, and she made a conscious choice that she was unsatisfied to be in a less than fully engaged employment situation. She felt that she would not be contributing as a team member and she would not see her projects from start to finish, and although she alleged that she would get fired because her inability to see projects through to the field, this has not been the case and this would not be a reason to avoid working. *I believe the claimant could work in an office type environment with the understanding that she may intermittently have nausea which would preclude her from working without a break or even from working uninterrupted or having symptoms which might require her to call in sick or go home. The frequency of these types of more severe days is unknown.*
>
> To summarize the above, although the claimant has nausea, she is demonstrably functional and could perform in a modified work environment. Modifications would

be limited to office work and avoidance of field work.

(CR at 635-36 (emphasis added).) Dr. Mehta was asked whether there was evidence of symptom magnification, lack of full effort, inconsistent findings, or malingering, and he responded "No." (Stip. 33 (first); CR at 631-38.)

In correspondence dated August 21, 2014, United of Omaha terminated Wonsowski's benefits as of August 18, 2014.[4] As described above, United of Omaha's vocational consultant had categorized Wonsowski's occupation as Mechanical-Design Engineer, Products (DOT #007.061-022), a sedentary occupation. United of Omaha determined that Wonsowski had the residual functional capacity to return to work in her regular occupation based on its review of the medical records. (Stip. 34 (first); CR at 613-23.)

On February 10, 2015, Wonsowski appealed the denial of benefits, submitting additional materials including a gastroenterology residual functional capacity questionnaire completed by Dr. Jain. (Stip. 29-30(second); CR at 123-42, 154-56.). Dr. Jain listed diagnoses of "severe gastroparesis (idiopathic), osteoporosis, cachexia, failure to thrive, compression fractures, weight loss, malnutrition, and severe protein cal." Dr. Jain also listed the following symptoms: recurrent nausea/vomiting, sleep disturbance, weakness, persistent/recurrent abdominal pain, cramping and tenderness, poor appetite with weight loss, emesis, chronic fatigue, vertebral spine fractures, rib fractures, rib pain. Severity was listed at 10/10 and described as "episodic" with pain "a few times a day, lasts for a few hours." Dr. Jain stated that Wonsowski's prescribed medication causes drowsiness, and that, while the pacer helps her nausea, it causes shocks with movement. Dr. Jain

_____

[4] The parties stipulated to a correspondence dated August 2, 2014, but that correspondence is dated August 21, 2014 in the claims record.

wrote that Adderal helped with drowsiness and fatigue, but caused tachycardia and insomnia. If Wonsowski were placed in a competitive job, Dr. Jain deemed her unable to perform or be exposed to public contact, routine, repetitive tasks at consistent pace, detailed or complicated tasks, strict deadlines, fast paced tasks, and exposure to work hazards. She also reported that "stress aggravates [Wonsowski's] vomiting." Dr. Jain opined that in an eight-hour work day, Wonsowski could sit less than two hours per day, and stand and walk each for less than two hours per day. She also anticipated that Wonsowski would need more than ten unscheduled restroom and additional breaks during an average workday due to abdominal pain, fatigue, adverse effects of medication, recurrent vomiting, and nausea. (Stip. 30 (second); CR at 154-57.)

Wonsowski's appeal also included an office visit note from August 29, 2014 from Stephen Skjei, M.D., who saw her for complaints of osteoporosis/metabolic bone disease. (Stip. 31 (second).) In addition to the pars fractures, Wonsowski had two rib fractures from shoveling snow in February 2014, and later, a bone contusion, or internal fracture, in her right wrist in September 2015. (Tr. at 38-40.) In November 2014, Dr. Skjei recommended that she start the osteoporosis medication Forteo, although he advised that Forteo might cause nausea. (CR at 159.) At the trial, Wonsowski testified that in June 2015, she began self- injecting Forteo daily. (Tr. at 77-78.) The injections have a side effect of a burning sensation and nausea. (Tr. at 78-79.) The records also report the results of bone density testing performed on December 8, 2014. Dr. Skjei noted that Wonsowski "has given up on having children, which was one consideration weighing against use of bisphosphonates in the past." (Stip. 31 (second); CR at 158-63; 171-72.)

The appeal included records from Dr. Elli, who followed up treating Wonsowski after the original gastric stimulator placement in 2010 and replacement in 2012 (CR at 173-82), and notes

by gastroenterologist Dr. Samuel Barkatullah from an October 29, 2014 visit, stating: "The problem [gastroparesis] is severe. The problem has not changed. The symptoms are constant." (CR at 273-77.) Additional records from Wonsowski's Social Security disability claim also were provided, including those of Dr. Holland (CR at 315-26); Dr. Jain (CR at 327-92); Dr. Gashkoff (CR at 393-426); Central DuPage Hospital (CR at 427-35); Mayo Clinic (CR at 436-49); and Dr. Elli at University of Illinois (CR at 450-526). (Stip. 34 (second).)

United of Omaha sent the file out for a peer review. (Stip. 34 (third)-35.) Gastroenterologist Caryn Berkowitz, M.D., reviewed Wonsowski's file but did not examine her. In her report dated March 17, 2015, Dr. Berkowitz reported that Wonsowski had diagnoses of a number of medical conditions, including gastroparesis, constipation, osteoporosis, back pain, abdominal pain, cervical spine problems, insomnia, scoliosis, lumbar spondylolysis with facet anthropathy, and vagus nerve dysfunction. (CR at 91.) She noted that a jejunostomy tube was placed in 2006, "suggesting that Ms. Wonsowski had significant malnutrition associated with her initial weight loss. However, more recently, despite Ms. Wonsowki's stable but low weight, she did not have other evidence of malnutrition." (Stip. 35; CR at 105.)

Dr. Berkowitz also commented on what she described as the "extensive medication trials" Wonsowski had tried over the years to relieve her symptoms. (*See* CR at 96, 98, 103.) In October 2013, her medications included: magnesium, multi-vitamins, Allegra-D, Flonase, Lunesta, mirtazapine, potassium chloride, Zantac, Adderall, famotidine, meclizine, Tigan and Zofran. (CR at 99.) By 2014, her weight was down to 100 pounds. (CR at 100.) In October 2014, Wonsowski was using enemas two to three times per week to relieve constipation because laxatives were ineffective. (CR at 101.)

Dr. Berkowitz opined that due to Wonsowski's medical conditions, she has "functional limitations and medically necessary restrictions based on her gastroparesis with nausea and weight loss," but maintained the residual functional capacity to perform full-time sedentary level activity for eight hours per day for a total of 40 hours per week, sitting for up to eight hours per day with position changes as needed. Dr. Berkowitz opined that Wonsowski would "require some flexibility of her hours and her breaks given the nausea. She will also require unrestricted access to the bathroom in case of vomiting." Dr. Berkowitz opined that Wonsowski could stand, walk, bend, squat, and carry or lift objects up to ten pounds occasionally and explained that Wonsowski's medical problems would interfere with her ability to perform more strenuous activities, such as frequent standing and walking, frequent bending, and regularly lifting and carrying heavier objects.

Dr. Berkowitz further opined that the restrictions and limitations provided by Dr. Jain "are not fully supported." She noted that Dr. Jain indicated on the October 20, 2014 questionnaire that Wonsowski "could not perform detailed, complicated or fast paced tasks," but, Dr. Berkowitz stated, Wonsowski was "able to drive to appointments and run errands," with driving being a "complex activity requiring fine motor coordination, concentration, processing speed, executive functioning, and memory." Dr. Berkowitz also disagreed with Dr. Jain's sitting limitations given that Wonsowski "was able to complete her independent medical evaluation and she was able to sit in the car for 75 minutes while traveling to and from the evaluation." Dr. Berkowitz disagreed with Dr. Jain's statement that Ms. Wonsowski would require two hours of rest before returning to work. Dr. Berkowitz explained that while Wonsowski "required breaks for nausea during her functional capacity evaluation and reportedly while driving home from her independent medical evaluation[,] [t]hese breaks were for a short time. She was able to complete the functional capacity evaluation and

she was able to continue driving after a short break (surveillance video)." Dr. Berkowitz agreed with a ten pound lifting restriction and standing and walking each less than two hours per day. Dr. Berkowitz found "no evidence of symptom magnification, exaggeration, or secondary gain." (Stip. 35; CR at 91-110.)[5]

On March 19, 2015, United of Omaha upheld its initial determination to terminate Wonsowski's benefits as of August 18, 2014. (Stip. 36; CR at 83-87.)


Wonsowski's Testimony About Her Current Condition

Since April 2011, Wonsowski testified, her condition is "[u]p and down" and "constantly changing." (Tr. at 34.) She continues to see Dr. Jain regularly, as well as Dr. Gashkoff, Dr. Elli, Dr. Rejowski, and Dr. Skjei. (Tr. at 38.)

Nausea is "relentless," she testified, but the degree varies, depending on her medications and other factors. (Tr. at 41.) There is no predictability, which she finds frustrating. (Tr. at 42.) She takes eleven prescriptions daily and other "as-needed medications." (Tr. at 41-42.) She emphasized that her medications affect her daily life, with the "mind-altering" medications affecting her plans to drive, go to doctor appointments, and pick up groceries. (Tr. at 42-43.) She specifically mentioned Ativan, which helps her nausea but is "pretty much a mind eraser," as is Norco. (Tr. at 43.) Because medications and suppositories were not effective to stimulate colonic movement, she

---

[5] Dr. Berkowitz noted that Wonsowski initially declined Forteo as treatment for her osteoporosis "with the thought that she may want to become pregnant in the future." (CR at 96.) By November 2014, however, Wonsowski reported to Dr. Skjei that she had given up the thought of having children, and he recommended Forteo. (CR at 161-63.)

must use enemas a couple of times a week. (Tr. at 44-45.) In 2014, she weighed around 100 pounds, but by the time of the trial, she weighed about 123 pounds, including clothes. (Tr. at 71.)

She still experiences shocking from her gastric stimulator, although it is less severe because she takes Norco everyday. (Tr. at 50.) She testified that any activity where abdominal muscles contract can cause her to get shocked. (Tr. at 48-49.) Wonsowski emphasized she would have difficulty sitting completely upright due to shocking. (Tr. at 51.) She can mitigate the effect by reclining, wearing loose clothing, and holding her side. (Tr. at 49-50, 60.) The surveillance video taken by United of Omaha shows her holding her side. (Tr. at 50.)

When asked about her typical day, Wonsowski testified as follows:

> A typical day can really vary. Like my symptoms, the nausea is relentless. Some days, it gets really severe for no known reason. Other days, it's better or more tolerable when my meds are -- you know, I'm on several nausea meds. So if my meds are working and I can get up and shower and, you know, whatever, do the dishes, even get out grocery shopping or go see family or something, it's a pretty darned good day. But other days, if it's like really bad, then literally getting up from the couch and showering are probably not on the list. I'll literally get up just to take my meds or ask my husband just to bring me something, and I try to sleep it off if I can or just watch TV, just try not to, you know, think too much about it.

(Tr. at 40- 41.)

Wonsowski testified that she does basic household chores like the dishes and cooking, with her husband helping out. (Tr. at 46.) They employ cleaning service to help with the housework. (Tr. at 45.)

She stated that although some of the records note exercising and the gym, she only exercised on the urging of Dr. Jain to combat the osteoporosis, and has not been able to exercise often because of her nausea. (Tr. at 46- 47.) Wonsowski also acknowledged going to the grocery store and to doctor appointments, including as much as an hour away, as seen on the surveillance video, but said

that riding in a car make her nauseous. (Tr. 47-48.) She was, however, able to take a vacation in the summer of 2014 to Florida. (Tr. at 72, 80-81.)

She spends six to eight hours per day on her computer from her recliner when she is feeling well enough. (Tr. at 82-83.) Typically, she will also watch TV to pass the time. She will go on Facebook, look for deals on goods, and check out gastroenterology blogs to see if there are new medications. (*Id.*) She still has the books from the professional engineering examination, and for a while would try to do some problems, but found she could not. (Tr. at 52.) When she started taking Ativan and Norco recently, she began to have more memory problems and stopped trying to study for the PE examination because it was too frustrating. (Tr. at 83.)     .

## CONCLUSIONS OF LAW

The Policy requires Wonsowski to support her claim by providing proof of disability to United of Omaha, including documentation of her disabling condition and the extent of her disability. (CR at 45.) Wonsowski has the burden of proving she has satisfied the conditions necessary for benefits under the Policy. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 179 (7th Cir. 1994).

The parties agree that a *de novo* standard of review is applicable in this case. (Pl.'s Brief at 12-13; Def.'s Brief at 2-3.) Under a *de novo* review, "the district courts are not reviewing anything," rather,  the "ultimate question" is whether the plaintiff "was entitled to the benefits he sought under the plan." *Diaz v. Prudential Ins. Co. of Am. (Diaz II)*, 499 F.3d 640, 643 (7th Cir. 2007). The reviewing court "must come to an independent decision on both the legal and factual issues that form the basis of the claim. What happened before the Plan administrator or ERISA fiduciary is

irrelevant." *Id.* The focus should be on the events that have occurred between the conclusion that benefits were owed and the decision to terminate those benefits. *See Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 833 (7th Cir. 2009) (citing *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002)).


Wonsowski's Regular Occupation

To receive benefits under the Policy, a beneficiary must be unable to perform all of the material duties of her "regular occupation" on a full-time basis. (CR at 27.) "Regular occupation" is defined in the Policy as "a collective description of individual jobs as defined by the United States Department of Labor Dictionary of Occupational Titles." (*Id.*) The propriety of relying on the Dictionary of Occupational Titles is "open and shut" because the Policy explicitly incorporates the titles as a reference point for defining a beneficiary's regular occupation. *See Myers v. Life Ins. Co. of North America*, No. 07-CV-6197, 2009 WL 742718, at *17 (N.D. Ill. Mar. 19, 2009.) According to the Policy, ability to work "is not determined by the availability of a suitable position with Your employer," rather it is based your inability to work in any jobs that "are considered to belong to a given occupation due to similar job characteristics, requirements and qualifications." (CR at 27.) In other words, Wonsowski's duties at Miner are relevant only insofar as they aid the court in determining the proper regular occupation category.

The parties dispute the proper classification of Wonsowski's "regular occupation." There is no dispute that her occupation falls under Category 007 of the DOT: "Mechanical Engineer." (*See* Pl.'s Brief at 7.) The dispute concerns the appropriate subsection of that category. As discussed above, United of Omaha classified her occupation under subsection 007.061.022 "Mechanical-

Design Engineer, Products," a position at the sedentary exertional level. Wonsowski argues that the appropriate subsection is "Mechanical Engineer" under DOT category 007.061-014, a position at the light exertional level. (Pl.'s Brief at 6-8.) That subsection states:

> Researches, plans, and designs mechanical and electromechanical products and systems, and directs and coordinates activities involved in fabrication, operation, application, installation, and repair of mechanical or electromechanical products and systems: Researches and analyzes data, such as customer design proposal, specifications, and manuals to determine feasibility of design or application. Designs products or systems, such as instruments, controls, robots, engines, machines, and mechanical, thermal, hydraulic, or heat transfer systems, applying knowledge of engineering principles [DESIGN ENGINEER, PRODUCTS (profess. & kin.) Master Title]. Plans and directs engineering personnel in fabrication of test control apparatus and equipment, and development of methods and procedures for testing products or systems [TEST ENGINEER (profess. & kin.) Master Title]. Directs and coordinates fabrication and installation activities to ensure products and systems conform to engineering design and customer specifications. Coordinates operation, maintenance, and repair activities to obtain optimum utilization of machines and equipment. May design products and systems to interface machines, hardware, and software. May evaluate field installations and recommend design modifications to eliminate machine or system malfunctions. May specialize in specific field of mechanical engineering, such as heat transfer, hydraulics, electromechanics, controls and instrumentation, robotics, nuclear systems, tooling, air-conditioning and refrigeration; or in type of product, such as propulsion systems or machinery and mechanical equipment; or in type of work, such as steam or gas generation and distribution, steam plant engineering, or system planning.

(Def.'s Brief at 7-8.)

Both subsections incorporate the duties described under "Design Engineer, Products" Master Title, quoted above.

Miner's job description lists the position title as "Mechanical Engineer" and provides a description of the duties. Essential functions were listed as:

1) To design new products and modify existing products per customer specifications.

2) Design function to include the following:
    a) Part Design to meet the specifications, function and cost effectiveness.

23

        b) All testing, performance verification and sample part submission.
        c) Responsible for all production tooling design and procurement.
        d) Establishment of quality standards and specifications.

3) Documentation to include:
        a) All ISO9001/QS9000 documentation as specified in our procedures.
        b) All drawings
        c) BPCS data entry to include Item Master, Bills of Material and Routers.
        d) Completion of ECRs and ECNs.

4) Production Assistance
        a) Trouble shoot molds, tooling and processes
        b) Oversee Production start up of new products
        c) Work with quality on PPAP and other first article submissions

5) Sales Assistance
        a) Interface with customers to determine performance specifications
        b) Provide technical assistance to customers

6) General
        a) Maintain a current skill level with technologies
        b) Investigate new processes that are either cost reductions or provide a technological advantage

(CR at 1655.) Additionally, the marginal duties of the job required responsibility for supervising and providing instruction to research and development technicians, machinists, and manufacturing personnel for the purpose of making samples and during production start up and troubleshooting. (CR at 1656.) In a job description in connection with Wonsowski's application for benefits, Miner described Wonsowski's duties as "Computer aided design, data manipulation using various software, inspection and analysis of parts. Testing and supervising testing, overseeing some production for process improvements." (CR at 1685.) Miner reported that field trips to customers were rare, "Less than 3%." (*Id.*) Miner also reported that standing, walking, stopping, kneeling, crouching, crawling, reaching, climbing, pushing, pulling, lifting, and carrying were 0-33% of the job, and sitting was 67-100% of the job. (CR at 1686.) Miner listed computer use and examining the workings of detailed

parts as major tasks, as well as that alternating sitting and standing would not help the employee perform the job. (*Id.*)

Evaluating all the evidence, the court concludes that Wonsowski's regular occupation is best described as a Mechanical-Design Engineer, Products under to DOT # 007.061-022, an occupation at the sedentary level. The duties described by both Miner and Wonsowski fit with this position. In her application for benefits, Wonsowski described her position as "design new or modify existing designs, from concept/customer contact through production phase, ECR's, ECN's, drawings and all documents, test product/prototypes, assemble, coordinate assembly, etc." (CR at 1676.) She listed physical requirements as "lifting, bending, sitting, standing, thinking." (*Id.*) She testified at trial that she went out into the field only about two or three times a year. (Tr. at 16.) Although she testified that in her last days at Miner she was on her feet eight hours a day, she had been able to do her duties at her desk previously when she was using a feeding tube.

Whether Wonsowski Was And Continues To Be "Totally Disabled" Under The Policy

Under the Policy terms, Wonsowski is "Totally Disabled" if she is "unable to perform the material duties of [her] regular occupation on a full-time basis." (CR at 27.) Although United of Omaha emphasizes the evidence that Wonsowski is able to perform work at the sedentary exertional level, that is only part of the analysis, and in this situation, the less important part. Most of the material duties of Wonsowski's regular occupation are intellectual, not physical. "[U]nder an own occupation standard, medical evidence is only part of the equation. To assess a claimant's ability to perform his own occupation, a decisionmaker must be aware of, and apply, the requirements of the occupation." *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 381 (1st Cir. 2015) (citation

omitted).

The "Mechanical-Design Engineer, Products" occupation is "Highly Skilled" and requires a "Reasoning" capacity at Level 5: "Apply principles of logical or scientific thinking to define problems, collect data, establish facts, and draw conclusions. Interpret an extensive variety of technical instructions in mathematical or diagrammatic form. Deal with several abstract and concrete variables." (DOT 007.061-022, Appendix C.)

The "Core Tasks" and "Supplemental Tasks" of the occupation, as described by United of Omaha's Vocational Consultant, require a high degree of concentration for extended periods. Among the many tasks described are the following:

> Assist drafters in developing the structural design of products using drafting tools or computer-assisted design (CAD) or drafting equipment and software. Research, design, evaluate, install, operate, and maintain mechanical products, equipment, systems, and processes to meet requirements applying knowledge of engineering principles. . . . Develop, coordinate, or monitor all aspects of production, including selection of manufacturing methods, fabrication, or operation of product designs.

(CR at 1700-01.)

Neither Dr. Mehta nor Dr. Berkowitz evaluated whether Wonsowski could perform the intellectual tasks required of that occupation continuously, on a full-time basis, in light of her physical limitations and the many medications she was then taking and continues to take. At the time those doctors evaluated Wonsowski's medical records, she was taking, among other medications, Zofran and Tigan, which Dr. Jain reported cause drowziness. (CR at 154.) On the subject of Wonsowski's ability to perform complicated tasks, Dr. Berkowitz cited only the fact that Wonsowski was able to complete the functional examination (with breaks) and to drive 75 minutes to Dr. Mehta's office. That does not equate to an ability to perform the requirements of DOT

007.061-022 or the Core and Supplemental Tasks of the occupation on a full-time basis.[6]

United of Omaha argues that Wonsowski's claims of cognitive impairment are "self-reported." (Def.'s Brief at 7.) Here, those subjective complaints of pain and inability to concentrate are supported by the objective medical evidence. For example, Wonsowski has endured three surgeries to have a gastric stimulator implanted, replaced, and replaced again. She currently takes eleven prescription medications, including narcotic pain relievers. The surveillance video recorded that she had to pull over by the side of the road during her drive from the appointment with Dr. Mehta and that she was holding her side (the site of her gastric stimulator). That confirms that her reports of debilitating nausea and ongoing pain are not fabricated. Notably, both Dr. Mehta and Dr. Berkowitz reported that they saw no evidence that Wonsowski was exaggerating her syptoms or malingering.

Dr. Mehta appears to have been under the impression, based on his interview, that Wonsowski quit her job because she was unsatisfied with her level of performance: "[S]he made a conscious choice that she was unsatisfied to be in a less than fully engaged employment." (CR at 636.) However, Wonsowski worked full-time until April 5, 2011 when she had the gastric stimulator implanted. As she testified, she did not return because of the pain from the shocks, and she was eventually terminated. (Tr. at 82.)

Dr. Mehta did not dispute that Wonsowski's nausea, although self-reported, was real. He "believe[d] [Wonsowski] could work," perhaps requiring a "modified work schedule" that would tolerate an unpredictable number of "severe days" when Wonsowski would be precluded from

---

[6] Dr. Berkowitz's conclusion that Wonsowski completed the functional examination (CR at 107) is not entirely correct. Wonsowski was not able to complete the eight-minute treadmill test because of nausea, which the examiner confirmed was genuine.

working uninterrupted, might have to call in sick, or might have to go home.  (CR at 636.)  That does not describe a full-time professional occupation.

Wonsowski testified that she can use her computer six to eight hours a day, at home on a reclining sofa.  United of Omaha cites this as evidence that Wonsowski can do full-time work. However, she testifed that her computer use consists of looking at websites, alternated with TV watching and resting when she needs to.  "[A] person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."  *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).  The ability to recline on a sofa cruising the internet does not translate into an ability to perform the intellectual demands of a highly skilled professional occupation on a full-time basis.  *See, e.g., Voight v. Colvin*, 781 F.3d 871, 878-79 (7th Cir. 2015) (questioning assumption that doing limited online research or playing video games requires the same concentration as required for full-time employment).

Having observed her testimony, the court finds Wonsowski to be a credible witness.  The evidence shows that she is a motivated professional, having achieved a patent and having studied for and taken the professional engineering examination.  Like Dr. Mehta and Dr. Berkowitz, the court finds no evidence that she is malingering or exaggerating her symptoms.  Her professional career was derailed by the physical conditions she has endured and the resulting cognative impairments that preclude her from performing her regular occupation on a full-time basis.[7]

---

[7]  Wonsowski also argues that the court should consider the fact that the Social Security Administration determined that Wonsowski is entitled to disability benefits, and also consider that United of Omaha facilitated Wonsowski's getting those benefits because it enabled United of Omaha to reduce its payments.  (Pl.'s Brief at 11.)  The significance of a finding of disability under the Social Security standard is questionable because "[a] finding of disability under the Social Security program need not imply disability for any other purpose."  *Krolnik*, 570 F.3d at 844 (citing *Cleveland v. Policy Management Systems Corp*, 526 U.S. 795 (1999)).  The court finds that it is unnecessary

## CONCLUSION

For the reasons set out above, the court finds and orders as follows:

1. United of Omaha improperly terminated Wonsowski's long term disability benefits under the Policy because, as of August 18, 2014, she was unable to perform all of the material duties of her regular occupation on a full-time basis.

2. Wonsowski remains unable to perform all of the material duties of her regular occupation on a full-time basis through the date of this Opinion and Order.

3. United of Omaha shall pay benefits, including prejudgment interest, to Wonsowski pursuant to the Policy through the date when the court enters the final judgment. To enable the court to enter the judgment amount, the parties shall jointly submit a stipulated calculation of the judgment amount no later than June 7, 2016.

4. Pursuant to 29 U.S.C. § 1132(g), Wonsowski shall recover her reasonable attorneys' fees and costs in this action. The parties shall follow the procedures in Local Rule 54.3. Any motion by Wonsowski for attorneys' fees will not delay the entry of final judgment.

It is so ordered and adjudged.

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

June 2, 2016

_____

to reach that issue in this case.